Rel: August 7, 2026

**Notice:** This opinion is subject to formal revision before publication in the advance sheets of **Southern Reporter**. Readers are requested to notify the **Reporter of Decisions**, Alabama Appellate Courts, 300 Dexter Avenue, Montgomery, Alabama 36104-3741 ((334) 229-0650), of any typographical or other errors, in order that corrections may be made before the opinion is published in **Southern Reporter**.

# ALABAMA COURT OF CIVIL APPEALS

## SPECIAL TERM, 2026

_____

### CL-2025-0638 and CL-2025-0639

_____

### M.J.

### v.

### Macon County Department of Human Resources

_____

### CL-2025-0751 and CL-2025-0760

_____

### M.L.

### v.

### Macon County Department of Human Resources

### Appeals from Macon Juvenile Court
### (JU-22-22.02 and JU-22-14.03)

BOWDEN, Judge.

M.J. ("the mother") and M.L. ("the father") appeal from judgments of the Macon Juvenile Court ("the juvenile court") terminating their parental rights to M.A.J. and H.L. ("the children"). We hold that the father's appeals are untimely and have failed to invoke the appellate jurisdiction of this court. We also hold that the juvenile court could have reasonably found that the evidence regarding the mother's inability to consistently implement parenting skills clearly and convincingly established that she had failed to adjust her circumstances to meet the needs of the children in accordance with an agreement with the Macon County Department of Human Resources ("DHR"). The juvenile court could have also reasonably found that the evidence regarding the lack of beneficial bond between the mother and the children clearly and convincingly established that maintaining the status quo was not a viable alternative to terminating the mother's parental rights. Furthermore, there is no support for the mother's argument that the juvenile court improperly considered the children's best interests or her rehabilitation efforts when it determined that there were no viable alternatives to terminating her parental rights. Therefore, we dismiss the father's appeals for a lack of appellate jurisdiction and affirm the juvenile court's

CL-2025-0638, CL-2025-0639, CL-2025-0751, and CL-2025-0760

judgments insofar as they terminate the mother's parental rights to the children.

<u>Background and Procedural History</u>

In May 2022, DHR received a report from the Georgia Department of Family and Children Services indicating that the mother had tested positive for marijuana when giving birth to M.A.J. As a result, the mother was found to be "indicated" for child abuse/neglect. See § 26-14-8(a)(1), Ala. Code 1975. Three months later, DHR investigated a report regarding domestic violence, drug use, and inadequate supervision of the children in the family home. The mother was then found to be "indicated" for neglect and inadequate supervision of the children. DHR implemented an out-of-home safety plan for the children and placed them with their maternal grandmother. However, the maternal grandmother did not have stable housing and eventually moved into the family home with the parents. The children were then placed in foster care with S.G. ("the foster mother"), where they have remained since August 2022.

On December 18, 2024, DHR filed petitions to terminate the parental rights of the mother and the father to the children. DHR alleged, among other things, that the mother was unable to care for the children

3

because of an emotional illness, mental illness, or mental deficiency and that the father had been convicted of and imprisoned for a felony and had failed to maintain consistent contact or communication with the children. The foster mother filed a verified motion to intervene in the matters on April 21, 2025, which was granted. The foster mother subsequently filed a motion for custody of the children and requested that the juvenile court terminate the parental rights of the mother and the father.

The juvenile court conducted a trial on DHR's petitions and the foster mother's motion for custody on July 8, 2025, and July 9, 2025. The juvenile court entered judgments on July 23, 2025, terminating the parental rights of the mother and the father and awarding "legal and physical care, custody, and control" of the children to the foster mother "for her to pursue adoption of [the children]." Among other things, the juvenile court made the following findings:

> "As it pertains to the mother … the court commends her for attempting to comply with most of the services offered by [DHR]. But the Court is concerned about the mother's current pregnancy that has caused her to be noncompliant with her required mental health medication regimen. It is undisputed that the mother has a history of mental illness and now she is expecting another child, which based on the mother's testimony, she must raise with little to no support from this [expected] child's father. The mother previously had trouble coping with raising [the children] when [they] were in her care

4

and custody. It was apparent from the mother's demeanor and testimony at the hearing that she would have very little support, with the raising of three young children, and such circumstances would prove to be very stressful for the mother. The Court finds that the mother's untreated mental illness would render her unable to care for the needs of [the children], in her home, without a safety plan being in place, with in home services being warranted, according to the testimony of Licensed Psychologist, Dr. Bridget Smith, who performed psychological evaluations on the mother ... and [the children]. Dr. Smith further found that when she observed the mother with the children during the mother's supervised visitations, the mother appeared distant, uninvolved, tired, lethargic, bored and demonstrated no positive affect towards the children, and that the mother appeared depressed.

"....

"... Based on the application of ... case law, the Court finds that maintaining the status quo is not a viable alternative under the facts before this Court.

"The Court finds that at some point, the need for permanency and stability for [the children], overcomes any good faith but unsuccessful attempts by the mother to become a suitable parent. ...

"....

"The Court finds that severing the ties between [the children] and the current foster mother is contrary to the best interest of [the children], and based on the findings discussed above, there are more than one other ground to terminate the rights of both the mother ... and the father ... so that [the children] can be adopted by [the foster mother] ...."

The mother filed a notice of appeal from the juvenile court's judgments on August 2, 2025. The mother subsequently filed a motion to

alter, amend, or vacate the judgments. DHR filed a postjudgment motion on August 6, 2025, arguing that the judgments were not final because the juvenile court had not awarded "permanent legal custody" of the children in compliance with § 12-15-320(b), Ala. Code 1975.[1] The mother subsequently filed a motion to dismiss her appeals, in part, because she wanted to "preserv[e] her right to refile an appeal following the entry of a final judgment in the [j]uvenile [c]ourt."

After a hearing, the juvenile court entered an order on August 17, 2025, granting DHR's postjudgment motion and noting that it had inadvertently omitted the word "permanent" when it awarded "legal and physical custody, care, and control" of the children to the foster mother. The juvenile court stated in that order that it had lost jurisdiction to

---

[1]
"If the juvenile court determines that the parents of a child are unwilling or unable to act as parents and terminates their parental rights, it may do the following:

"....

"(2) Transfer or continue the permanent legal custody of the child to the petitioner who, after study by [DHR], is found to be able to properly receive and care for the child."

§ 12-15-320(b).

dispose of the mother's postjudgment motion when she filed her notice of appeal.[2]

On August 21, 2025, the mother filed another motion to alter, amend, or vacate the judgments that was virtually identical to her first postjudgment motion. The father filed a motion to alter, amend, or vacate the judgments on August 22, 2025. After a hearing, the juvenile court entered an order purporting to deny those postjudgment motions. The father filed a notice of appeal on September 8, 2025.

---

[2]We note that the filing of a notice of appeal from a final judgment does not divest the trial court of jurisdiction to rule on timely filed postjudgment motions.

> "As a general rule, the filing of a notice of appeal divests the juvenile court of jurisdiction over the case, except as to collateral matters. See S.H. v. Macon Cnty. Dep't of Hum. Res., 195 So. 3d 311, 313 (Ala. Civ. App. 2015). As a narrow exception to that rule, however, a juvenile court retains jurisdiction to receive and rule on a timely postjudgment motion to amend a judgment that is filed by a party after the filing of a notice of appeal. See Ex parte Andrews, 520 So. 2d 507, 510 (Ala. 1987); Herring v. Madison Cnty. Dep't of Hum. Res., 279 So. 3d 1151, 1160 (Ala. Civ. App. 2018)."

A.R. v. T.R., 375 So. 3d 1259, 1262-63 (Ala. Civ. App. 2022).

The Finality of the Judgments

As we have noted, DHR argued in its postjudgment motion, and the mother appeared to agree, that the July 23, 2025, judgments were not final because the juvenile court had not awarded "permanent legal custody" of the children in compliance with § 12-15-320(b). If the judgments were nonfinal, the mother's notice of appeal would have divested the juvenile court of jurisdiction to enter any subsequent orders, and the parties' respective appeals would be due to be dismissed. See Erskine v. Guin, 384 So. 3d 583, 598 (Ala. 2023). Thus, we address the finality of the judgments before addressing the parties' arguments.

We have stated that when "there has been no disposition of the permanent legal custody of the child or children at issue in accordance with § 12-15-320(b), this court will dismiss any appeal from that judgment as having been taken from a nonfinal judgment." S.H. v. Macon Cnty. Dep't of Hum. Res., 195 So. 3d 311, 314 (Ala. Civ. App. 2015). The term "permanent legal custody" is not defined in § 12-15-101 et seq., Ala. Code 1975. However, the terms "permanent legal custody" and "legal

custody" are used interchangeably in §§ 12-15-320 and -321, Ala. Code 1975.[3]

When entering a judgment terminating parental rights, the best practice for juvenile courts is to track the language of § 12-15-320(b) and specifically award "permanent legal custody" of the child at issue to an appropriate party. Although the juvenile court did not use the phrase "permanent legal custody" in the judgments, the juvenile court awarded "legal and physical custody, care, and control" of the children to the foster mother "for her to pursue adoption of [the children]." Even if that could be construed as a nonpermanent custody award, which we do not think that it can be, we have said that "a 'temporary custody award' or a 'temporary order' as to custody is a 'final' custody award or judgment." T.J.H. v. S.N.F., 960 So. 2d 669, 672 (Ala. Civ. App. 2006). Furthermore, the juvenile court simultaneously awarded custody of the children to the

---

[3]Compare Ala. Code 1975, § 12-15-320(b) ("If the juvenile court determines that the parents of a child are unwilling or unable to act as parents and terminates their parental rights, it may do the following: (1) Transfer or continue the permanent legal custody of the child to the Department of Human Resources ...." (emphasis added)), with § 12-15-321 ("Where the juvenile court has terminated the parental rights and has placed legal custody of the child with the Department of Human Resources ...." (emphasis added)).

foster mother when it terminated the parental rights of the parents, which we have described as an "immediate, permanent, and irrevocable" disposition. K.R.S. v. DeKalb Cnty. Dep't of Hum. Res., 236 So. 3d 910, 914 (Ala. Civ. App. 2017).

Therefore, under the facts and circumstances of these cases, we hold that the juvenile court complied with the requirements of § 12-15-320(b) when it awarded "legal and physical custody, care, and control" of the children to the foster mother. As a result, the juvenile court's July 23, 2025, judgments were final.

The Father's Appeals -- CL-2025-0751 and CL-2025-0760

Although the parties have not raised the issue, we can take notice of whether the father's appeals are timely because the timeliness of his appeals implicates this court's appellate jurisdiction. See Rule 2(a)(1), Ala. R. App. P.; see also Gunnison-Mack v. Alabama State Pers. Bd., 923 So. 2d 319, 320 (Ala. Civ. App. 2005) ("'"[J]urisdictional matters are of such magnitude that we take notice of them at any time and do so even ex mero motu."'" (citations omitted)).

The juvenile court entered the judgments on July 23, 2025. The father had 14 days from that date to file a postjudgment motion, see Rule

1(B), Ala. R. Juv. P., or a notice of appeal. See Rule 4(a)(1), Ala. R. App. P. The 14-day period within which the father was required to file a notice of appeal was suspended when the mother timely filed her first postjudgment motion on August 5, 2025. See Rule 4(a)(3), Ala. R. App. P.; see also Matherly v. Citizens Bank, 375 So. 3d 776, 782 (Ala. 2022)("'The running of the time for taking an appeal is tolled as to all parties, not just the one who filed the post-judgment motion.'" (citation omitted)). The mother's first postjudgment motion was denied by operation of law on August 19, 2025, after it had been pending for 14 days. See Rule 1(B), Ala. R. Juv. P. Thus, the father had 14 days from that date, or until September 2, 2025, to file a notice of appeal. See Rule 4(a)(3), Ala. R. App. P.

The August 17, 2025, order did not give the father another 14-day period within which to file a postjudgment motion. As we have explained, the judgments were final. By adding the word "permanent" to the custody award, the juvenile court merely corrected a clerical error in the judgments. See Rule 60(a), Ala. R. Civ. P. Thus, the August 17, 2025, order related back to the date of the judgments. See A.T. v. D.M., 265 So. 3d 294, 299 (Ala. Civ. App. 2018). As a result, the father had 14 days from

the date of the judgments -- not 14 days from the date of the August 17, 2025, order -- to file a postjudgment motion. See Rule 1(B), Ala. R. Juv. P. The father did not file a postjudgment motion until August 22, 2025. Hence, the father's postjudgment motion was untimely and did not affect the timeliness of his appeals. See F.G v. State Dep't of Hum. Res., 988 So. 2d 555, 557 (Ala. Civ. App. 2007)(holding that the parents' postjudgment motion that was filed 30 days after the entry of the termination-of-parental-rights judgment was untimely and did not suspend the time for filing their notice of appeal).

Likewise, the mother's second postjudgment motion did not affect the timeliness of the father's appeals because it was an impermissible, successive postjudgment motion. See BancTrust Co. v. Griffin, 963 So. 2d 106, 109 (Ala. Civ. App. 2007).

Because the father did not file a notice of appeal until September 8, 2025, his appeals are untimely and, thus, have failed to invoke the jurisdiction of this court. See State Farm Mut. Auto. Ins. Co. v. Pettway, 401 So. 3d 298, 301 (Ala. Civ. App. 2024)("This court has no appellate jurisdiction over an untimely appeal."). Therefore, we dismiss the father's

CL-2025-0638, CL-2025-0639, CL-2025-0751, and CL-2025-0760

appeals for a lack of appellate jurisdiction. See Rule 2(a)(1), Ala. R. App. P.

The Mother's Appeals -- CL-2025-0638 and CL-2025-0639

Standard of Review

"The ore tenus rule applies to a termination of parental rights case." In re Colbert, 474 So. 2d 1143, 1145 (Ala. Civ. App. 1985). Under the ore tenus rule, "'[t]he juvenile court's judgment based on ... ore tenus evidence is presumed to be correct and will not be overturned absent a showing that the judgment is plainly and palpably wrong.'" Montgomery Cnty. Dep't of Hum. Res. v. T.S., 218 So. 3d 1252, 1261 (Ala. Civ. App. 2016)(citation omitted). "'The presumption of correctness, however, is rebuttable and may be overcome where there is insufficient evidence presented to the trial court to sustain its judgment.'" Waltman v. Rowell, 913 So. 2d 1083, 1086 (Ala. 2005) (citation omitted). Evidence is insufficient to sustain a judgment when it fails to meet the "clear and convincing" standard of evidence. C.C. v. C.T., 375 So. 3d 38, 42 (Ala. Civ. App. 2022)("This Court will reverse '"a juvenile court's judgment terminating parental rights only if the record shows that the judgment is not supported by clear and convincing

13

evidence."'" (quoting <u>S.P. v. Madison Cnty. Dep't of Hum. Res.</u>, 315 So. 3d 1126, 1130 (Ala. Civ. App. 2020))).

> "'"[T]he evidence necessary for appellate affirmance of a judgment based on a factual finding in the context of a case in which the ultimate standard for a factual decision by the trial court is clear and convincing evidence is evidence that a fact-finder reasonably could find to clearly and convincingly establish the fact sought to be proved. Even if an appellate court in considering the evidence of record would reach its own conclusion that the evidence presented does not clearly and convincingly establish the fact sought to be proved, it is not for that court to act upon its own factual determination but to determine instead whether the fact-finder below reasonably could have made a different finding based on the same evidence."'
>
> "<u>Ex parte McInish</u>, 47 So. 3d [767,] 776 [(Ala. 2008)] (quoting <u>KGS Steel, Inc. v. McInish</u>, 47 So. 3d 749, 761 (Ala. Civ. App. 2006)(Murdock, J., concurring in the result))."

<u>Ex parte Bodie</u>, 377 So. 3d 1051, 1056 (Ala. 2022).

Analysis

I.   <u>Whether there was sufficient evidence that the mother was unable or unwilling to discharge her responsibilities to and for the children</u>

The mother challenges the sufficiency of the evidence regarding the grounds to terminate her parental rights. The mother specifically argues that there was no evidence indicating that her mental or other condition

14

rendered her unable to care for the children at the time of the termination-of-parental-rights trial. We disagree.

A juvenile court may terminate parental rights

"[i]f the juvenile court finds from clear and convincing evidence … that the parents of a child are unable or unwilling to discharge their responsibilities to and for the child, or that the conduct or condition of the parents renders them unable to properly care for the child and that the conduct or condition is unlikely to change in the foreseeable future …."

§ 12-15-319(a), Ala. Code 1975. A juvenile court is required to consider a list of nonexclusive factors when determining whether a parent is unable or unwilling to discharge responsibilities to and for their child and, thus, whether to terminate parental rights. The juvenile court relied on the following factors, among others, when it terminated the mother's parental rights:

"(2) Emotional illness, mental illness, or mental deficiency of the parent … of a duration or nature as to render the parent unable to care for the needs of the child.

"….

"(12) Lack of effort by the parent to adjust his or her circumstances to meet the needs of the child in accordance with agreements reached, including agreements reached with local departments of human resources or licensed child-placing agencies, in an administrative review or a judicial review."

§ 12-15-319(a).

One of the reunification goals agreed to by DHR and the mother was for the mother to consistently implement parenting skills and practices during supervised visits with the children. In July 2024, the mother completed a parenting class designed to teach parents how to listen, empathize, and redirect children from dangerous or harmful behaviors. However, DHR presented evidence during the termination-of-parental-rights trial indicating that, even after completing the parenting class, the mother was disengaged from the children and was unable to consistently implement parenting skills during supervised visits. Miyosha Curry, a DHR employee who had supervised the mother's visits with the children, testified that the mother had not improved her ability to engage with the children during supervised visits. Curry testified that the mother was more reactive than proactive during visits and that the mother was "usually real quiet, nonverbal" during visits. Curry further testified that the mother "kind of like … zones out a bit" during visits and paid attention to Curry rather than the children. Angelique Woods, a DHR employee, testified that she was concerned with the mother's "inattention to the kids" and that the mother would let the children "run

16

off" during supervised visits. Woods also testified that DHR employees "had to intervene on several visits with the kids, screaming, kicking, throwing over tables, throwing over chairs. We[, DHR employees,] have had to try to stop the kids from hitting [the mother]." Dr. Bridget Finlen Smith, a psychologist, testified that she had observed a visit between the mother and the children in October 2024. Dr. Smith testified that she "didn't see a lot of skill demonstrated [from the mother] on how to interact with children and try to prevent tantrums or how to redirect when they are upset or how to be reactive" during that visit.

The mother testified that she had been diagnosed with "bipolar depression" during one of her hospitalizations at East Central Alabama Mental Health Center. Dr. Smith testified that she had performed a psychological evaluation of the mother in September 2024 and had diagnosed the mother with "bipolar 1" disorder, in partial remission, and posttraumatic stress disorder. According to Dr. Smith,

> "[b]ipolar [disorder] is a very serious mood disorder. It's chronic. …
>
> "Bipolar 1 [disorder] is the more serious of the bipolar disorders. Bipolar 2 [disorder] would often be people that are fairly high functioning in the community that might be on medication and lots of people might not know that they have bipolar [disorder].

17

"Bipolar 1 [disorder] generally is considered [to be] people who may be at high risk for hospitalization, who have more extreme mood swings; and when they are manic, may be quite impulsive and use poor judgment."

Dr. Smith testified that, when she observed a visit between the mother and the children in October 2024, the mother "appeared depressed and flat and not interactive with the children." Dr. Smith testified that, "if [the mother] was in a depressive episode, that would have been [a typical] interaction between her and her children" but that, "[i]f she was not in a depressive episode, then it would have been a clear sign … of [a] lack of intuitive parenting, [a] lack of bonding and affection, a lack … of [an] awareness of what your children need when you are interacting with them."

We acknowledge that there was some evidence in the record indicating that, during her supervised visits with the children, the mother had been able to implement some of the parenting skills that she had learned. However, it is not the role of this court to reweigh the evidence. D.M. v. Dale Cnty. Dep't of Hum. Res., 413 So. 3d 750, 752 (Ala. Civ. App. 2024). Based on our review of the evidence in the record, the juvenile court could have reasonably concluded that DHR had clearly and convincingly established that the mother had demonstrated a lack of

18

effort to adjust her circumstances to meet the needs of the children because she had been unable or unwilling to consistently implement parenting skills and practices during supervised visits with the children.[4]

II.  Whether there was sufficient evidence that there were no viable alternatives to terminating the mother's parental rights

The mother argues that leaving the children in foster care was a viable alternative to terminating her parental rights. We disagree.

"[A]s a general rule, '"maintaining a child in indefinite foster care is not a viable alternative to termination of parental rights."'" B.T. v. Jefferson Cnty. Dep't of Hum. Res., 432 So. 3d 32, 42 (Ala. Civ. App. 2025) (citations omitted). "[M]aintaining the status quo is a viable option to terminating parental rights when the parent and the child enjoy a relationship with some beneficial aspects that should be preserved such that it would be in the child's best interests to continue that relationship." S.N.W. v. M.D.F.H., 127 So. 3d 1225, 1230 (Ala. Civ. App. 2013).

At the time of the termination-of-parental-rights trial, the children had been in foster care for nearly three years, and the evidence indicated

---

[4]We pretermit discussion of the other factors on which the juvenile court could have based its decision to terminate the mother's parental rights. See K.A.P. v. D.P., 11 So. 3d 812, 819 (Ala. Civ. App. 2008).

19

that the foster mother was willing and able to adopt the children. The foster mother testified that she had bonded with the children and considered them to be part of her family.

The evidence also indicated that the children did not have a beneficial relationship with the mother. Dr. Smith testified that, during the supervised visit that she observed in October 2024, the children did not treat the mother as their mother, the mother was distant and disengaged, and the children showed minimal affection toward the mother. Woods testified that "right now there appears to be no bond with [the mother]." Woods also testified that the children are not generally uncontrollable but that, "[w]hen the children are in the visits with [the mother], they are out of control." Curry also testified that she had observed the children acting out of control only during the mother's supervised visits.

Based on that evidence, the juvenile court could have reasonably concluded that DHR had presented clear and convincing evidence establishing that maintaining the status quo was not a viable alternative to terminating the mother's parental rights.

III. Whether the juvenile court erred by considering the best interests of the children and the mother's rehabilitation efforts in its viable-alternatives analysis

The mother argues that the juvenile court improperly considered the best interests of the children and her rehabilitation efforts when it determined that there were no viable alternatives to terminating her parental rights. Specifically, the mother argues that the "children's need for permanency should not outweigh rehabilitation efforts of DHR and [that] the sufficiency of DHR's rehabilitation efforts is not relevant to whether no viable alternative exists" to terminating her parental rights. The mother's brief, p. 65.

The mother relies exclusively on former Chief Justice Parker's special writing in Ex parte Bodie, 377 So. 3d at 1064-69 -- the purpose of which was to provide "a suggested framework" regarding terminating a parent's parental rights -- as the basis for her argument. Id. at 1064 (emphasis added). However, no other Justice joined that writing, so it has limited persuasive authority. Cf. Ex parte Discount Foods, Inc., 789 So. 2d 842, 845 (Ala. 2001)("The precedential value of the reasoning in a plurality opinion is questionable at best.").

21

The main opinion in Ex parte Bodie, which was joined by eight of the supreme court's nine Justices, favorably cited propositions of law indicating that it had considered the best interests of the children in its viable-alternatives analysis. 377 So. 3d at 1063 ("'[M]aintaining a child in foster care indefinitely is not a viable alternative to termination of parental rights.' ... 'At some point [a child's] need for permanency must outweigh repeated efforts by [the Department of Human Resources] to rehabilitate [a parent].'" (citations omitted)). Furthermore, our supreme court noted in its viable-alternatives analysis that, in addition to abstaining from drug use, H.P., the mother in that case, would have had to address her lack of suitable housing and employment before being able to properly care for her children and held that "the juvenile court could have reasonably determined that the time frame for adequate rehabilitation was indefinite." Id. Thus, in Ex parte Bodie, our supreme court considered the best interests of the children in that case and H.P.'s rehabilitation efforts when determining whether there were viable alternatives to terminating H.P.'s parental rights. Therefore, the mother's argument that, based on Ex parte Bodie, the juvenile court

22

improperly considered the best interests of the children and the mother's rehabilitation efforts in its viable-alternatives analysis is not persuasive.

## Conclusion

The father's appeals are untimely and, thus, have failed to invoke the appellate jurisdiction of this court. The juvenile court could have reasonably found that the evidence regarding the mother's inability to consistently implement parenting skills clearly and convincingly established that she had failed to adjust her circumstances to meet the needs of the children in accordance with an agreement with DHR. The juvenile court could have also reasonably found that the evidence regarding the lack of a beneficial bond between the mother and the children clearly and convincingly established that maintaining the status quo was not a viable alternative to terminating the mother's parental rights. Furthermore, there is no support for the mother's argument that the juvenile court improperly considered either the children's best interests or her rehabilitation efforts when it determined that there were no viable alternatives to terminating her parental rights.

Therefore, we dismiss the father's appeals for a lack of appellate jurisdiction and affirm the juvenile court's judgments insofar as they terminate the mother's parental rights to the children.

CL-2025-0638 -- AFFIRMED.

CL-2025-0639 -- AFFIRMED.

Moore, P.J., and Edwards and Hanson, JJ., concur.

Fridy, J., concurs in the result, without opinion.

CL-2025-0751 -- APPEAL DISMISSED.

CL-2025-0760 -- APPEAL DISMISSED.

Moore, P.J., and Edwards, Hanson, and Fridy, JJ., concur.